ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of - | ) |
| | ) |
| Sungjee Construction Co., Ltd. | ) ASBCA Nos. 62002, 62170 |
| | ) |
| Under Contract No. W91QVN-14-D-0050 | ) |

APPEARANCE FOR THE APPELLANT:      Yong Eui Song, Esq.
         Central IP & Law
         Seoul, Korea

APPEARANCES FOR THE GOVERNMENT:    Scott N. Flesch, Esq.
         Army Chief Trial Attorney
         CPT Dmitrius Ramon McGruder, JA
         1LT Bryan R. Williamson, JA
         Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE EYESTER
PURSUANT TO BOARD RULE 11

This appeal arises from a termination for default by the Department of the Army (Army or government), 411th Contracting Support Brigade (411 CSB), of a task order issued to Sungjee Construction Company, LTD (Sungjee or appellant) for the repair of an officer dormitory on Osan Air Base located in the Republic of Korea. The Army terminated the task order for default due to appellant's failure to complete the project by the contract completion date (CCD). The Board has jurisdiction over the termination pursuant to the Contract Disputes Act, 41 U.S.C. § 7101. The parties elected to submit the appeal on the record pursuant to Board Rule 11. Because the government has established the validity of the default termination, and appellant has failed to demonstrate the default was excusable and entitlement to its claimed amounts, the appeals are denied.

FINDINGS OF FACT

1. On August 14, 2014, the 411 CSB awarded Sungjee indefinite-delivery, indefinite-quantity (IDIQ) Contract No. W91QVN-14-D-0050 to upgrade facilities for the United States Forces Korea (USFK) (R4, tab 1 at 1-3, 11). According to the contract, the contracting officer was "the only person authorized to modify the contract terms or take any action to enter into a change or contractual commitment on behalf of the Government" (*id.* at 12). In addition, as relevant here, the contract incorporated by reference Federal Acquisition Regulation (FAR) 52.249-10, DEFAULT (FIXED-PRICE CONSTRUCTION)(APR 1984), and FAR 52.242-14, SUSPENSION OF WORK

1

(APR 1984), and incorporated by full text Defense Federal Acquisition Regulation Supplement (DFARS) 252.201-7000, CONTRACTING OFFICER'S REPRESENTATIVE (DEC 1991) (*id.* at 23, 43). DFARS 252.201-7000, stated that the contracting officer's representative (COR) was "not authorized" to make any commitments or changes affecting price, quality, quantity, delivery, or any other contract term or condition (*id* at 23). All orders issued pursuant to this IDIQ contract were subject to its terms and conditions (*id.* at 44).

2. Because work was to be performed in Korea, the contract also included Navy Marine Corps Acquisition Regulation Supplement 5152.204-4018, IDENTIFICATION OF CONTRACTOR'S EMPLOYEES. According to this clause, contractors requiring entry to a U.S. Government installation had to be processed through the contracting officer or representative and approved for entry pursuant to USFK Regulation 190-7, which outlines the process for issuance of passes for base access. (R4, tab 1 at 32) USFK Regulation 190-7 (dated Sept. 27, 2017) stated that the sponsoring organization representative, which here was from the requesting or using activity, signs the pass applications, while the COR coordinates pass requests and validates the status of the contract prior to the approving official's consideration (R4, tab 36 at 24). Passes were valid for a maximum of one year (*id.* at 59). With respect to renewals of contractor passes, the requesting activity was to submit a memorandum for the renewal month with a list of names, the dates of the contract, and the contract with the extended contract period (*id.* at 31). The approving authority reviews this information, including the COR's memorandum, when making his/her decision. Renewal requests were to be submitted at least 30 days prior to the current pass expiration date (*id.* at 31).

3. On June 30, 2016, the 411 CSB issued fixed-priced Task Order No. W91QVN-14-D-0050, call order No. 0026, to Sungjee in the amount of $3,860,659.26 U.S. dollars for the repair of Officer Dormitory B929 at Osan Air Base (R4, tab 2 at 1-2). The task order, awarded against the above-referenced IDIQ contract, explained that Sungjee was to comply with all the terms and conditions of the contract unless stated otherwise (R4, tab 2 at 4). In addition, the task order set forth the repair work requirements, which included architectural, civil, mechanical, and electrical work (*id.* at 4-9). Sungjee was to prosecute diligently and complete the repair work on the dormitory no later than 450 calendar days after the government issued the notice to proceed (*id.* at 13). The government issued the notice to proceed on July 20, 2016, but later executed Modification No. 01 to the order stating the CCD was October 31, 2017 (R4, tabs 3 and 5).[1]

---

[1] While the final completion date--450 days from the notice to proceed--was mid October 2017 (*see* gov't br. at 3), the modification stated the CCD was October 31, 2017.

4.  As relevant here, the task order included the following instructions regarding access to the base:

> 2.  Access and general protection/security policy and procedures.  *This standard language is for contractor employees with an area of performance within Army controlled installation, facility, or area.*
>
> Contractor and all associated sub-contractors['] employees *shall provide all information required for background checks to meet installation access* requirements to be accomplished by installation Provost Marshal Office, Director of Emergency Services or Security Office. . . .

(R4, tab 2 at 15) (emphasis added)  While pass requests needed to be reviewed and approved by government officials, we find the onus of providing employee information and starting the pass request process was on the contractor.

5.  On August 12, 2016, Sungjee submitted its preliminary and initial project schedule (R4, tab 10).  The government-approved schedule showed phase 1 removal work would begin around September 4, 2016, and the final inspection would occur prior to the CCD on October 10, 2017 (*id.* at 1, 10, 24).

6.  On August 29, 2016, Sungjee emailed the government with a status report, including the status of base access passes (R4, tab 13 at 1, 3).  According to the email, Sungjee submitted its first request for passes for the architectural team, and its requests for the civil, mechanical, and electrical teams were "[o]n processing" (*id.* at 3).  Sungjee stated it would submit the rest of the pass requests by September 23, 2016 (*id.*).  The record shows, therefore, that Sungjee was delinquent in requesting passes on time at the start of the project as work started in early September, and Sungjee did not request passes for most of its employees until late September.

*First Request for an Extension*

7.  Two months before the CCD, in a letter dated August 31, 2017, Sungjee's contract manager requested a 90-day extension.  According to Sungjee, it experienced issues relating to the cold weather, and it performed additional work for the user's convenience and potential problems in the future.  Sungjee specifically stated it requested no additional money, just the additional time.  (R4, tab 32 at 1-3)  The government project engineer believed there should only be a 70-day extension because two of the additional items performed were required by the drawings and therefore were to be repaired/replaced by Sungjee (R4, tab 33 at 4-5).  Further, the base housing

office expressed concerned that there was no warehouse to store the furniture and appliances being delivered to the buildings at the end of the original CCD (*id*. at 3).

8. On September 21, 2017, the government issued no-cost unilateral Modification No. 02 to the task order. The modification extended the CCD to December 23, 2017, "due to several design changes for the user's convenience and adverse weather conditions." The modification further stated: "In return for the CCD extension, the contractor agrees to release the Government from any claims related to this time extension. All other terms and conditions remain unchanged." (R4, tab 35 at 1)

*Additional Requests for Extensions*

9. On December 15, 2017, Sungjee requested a 39-day extension stating it experienced issues relating to the cold weather and it performed additional work for the user's convenience and potential problems in the future (R4, tab 39 at 1-3). Again, Sungjee requested no additional money, just the additional time (*id.* at 1).

10. The Chief of Project Management recommended the contracting officer issue a no-cost modification extending the CCD and also believed Sungjee should be held liable for the cost of providing quarters for up to 30 personnel who would need to be relocated due to the delay in the completion of the dormitory, as well as the cost of any damages to the appliances and furniture that would need to be stored and delivered at a later time. (R4, tab 40 at 2) At this point in mid-December 2017, a contractor progress schedule showed the final inspection for the building to be completed by February 9, 2018 (R4, tab 41 at 2). The request for an extension was denied (R4, tab 54 at 1).

11. On December 28, 2017, the government issued a Contractor Performance Assessment Report (CPAR) for Sungjee on the task order (R4, tab 42). According to the CPAR, Sungjee was behind schedule and failing to manage its manpower, and the government was processing a time extension with a CCD of January 31, 2018 (*id.* at 1-2). Further, the CPAR showed an unsatisfactory rating for schedule and management and the government stated it would not recommend the contractor for a similar requirement in the future; Sungjee concurred with the CPAR (*id.* at 2).

12. In an email dated December 21, 2017, the contract specialist informed Sungjee the government would provide an extension *after* receiving and approving a progress schedule (R4, tab 43 at 9-10). The contract specialist further stated that Sungjee was liable for retrieval, delivery, and installation of furniture and appliances by January 5, 2018. Sungjee would also be responsible for all expenses incurred for furniture and appliance storage and any damages if the building was

4

not ready at that time.  Further, the contract specialist stated that Sungjee would be responsible for the cost of providing quarters to accommodate 30 individuals for each day until construction completion.  Sungjee was to provide a signed document confirming this obligation.  (*Id.* at 9)

13.  On December 28, 2017, after the amended CCD of December 23, 2017 passed, Sungjee emailed the contract specialist and stated, in relevant part:

> [Sungjee] Site staff[] and head office staff[] are all admitting most of the cause on [the] delay[] for [the] CCD of T.O#0026 is contractor's fault and The Government [has] been helping [the] contractor to complete project successfully.
>
> However, we are afraid that we have to ask The Government a few more days of time extension without any consideration since currently, our company (Sungjee Const.) is having serious financial problem[s].
>
> Sungjee [has] ordered and paid all of off-shore materials for this contract and paid more money to sub-contractor compare[d] to what they have [] complete[d] in their activities.
>
> And, [s]ince we have gotten the E-mail from the Government regarding consideration, we promised sub-contractor [] more money if they could complete their activities before 17th of Jan.2018.
>
> Considering we could complete all of our activities on [the] 19th, the  consideration would be almost $70,000 what we could not afford in our current financial status.
> * * * * *
>
> Despite [] contractor's faults, [w]e are asking you to give us more days time extension without consideration based on [the] attached schedule.

(R4, tab 43 at 6-8).  In response, the government asked Sungjee for a plan of action for the furniture and appliances if the building was not ready by January 5 (*id.* at 5-6). Sungjee stated it could not install the appliances on January 5 and would therefore find storage (*id.* at 4-5).  Sungjee further stated:  "Sorry for the [] trouble caused by our fault.  If possible we could take all of the consideration we mentioned and we

really want for that" (*id.* at 5). We find that Sungjee agreed to store and install the furniture and appliances as consideration for an extension of time. We also find that starting December 2017, Sungjee admitted it was having financial problems and these problems impacted the project.

14. Sungjee continued performing. According to COR daily inspection records in early January 2018, Sungjee's workforce consisted of several workers who were performing tasks such as installing gypsum board, painting walls, and installing light fixtures (R4, tabs 45-47, 49). For example, the COR's daily report for January 10, 2018, stated that 22 employees were on the site (R4, tab 46 at 1). At that time, Sungjee's revised progress schedule showed a CCD of February 14, 2018 (R4, tab 48 at 1).

15. In an internal government email, the noncommissioned officer in charge (NCOIC) of base construction provided a summary of performance to the contracting officer. The NCOIC explained that only eight days before the December CCD, at the NCOIC's request, Sungjee submitted another request for an extension, and it was unclear why they failed to submit a request earlier. This request was rejected because the alleged extra work performed was already part of the prior justification, and any alleged delay caused by cold weather was due to a lack of planning. Regardless, the Civil Engineer Squadron (CES) requested a 39-day time extension and CCD of January 31. At that point, however, the request by the CES had not been resolved. (R4, tab 50 at 2-4)

16. On January 29, 2018, Sungjee's contract manager informed the COR that it would deliver and install the appliances on February 5, 2018. Sungjee also stated it "would be responsible for [the] storing fee" if the delivery and installation were impossible and Sungjee's fault. Sungjee also requested review and cooperation with its extension request. (R4, tab 51) We find that Sungjee failed to meet the CCD, as extended, and therefore the appliances could not be installed.

*The First Show Cause Notice*

17. On February 1, 2018, the government issued Sungjee a show cause notice stating it may terminate the order for default because the government had provided an extension, and on January 11, 2018, Sungjee requested another extension until February 14, 2018, which was denied because the COR believed the project would not be completed until the middle of March (R4, tab 54 at 1-2). Sungjee acknowledged the show cause letter the next day (*id.* at 2).

18. Sungjee continued to perform work. On February 6, 2018, the COR issued a report stating the contractor had 15 employees on the contract, which was not enough manpower (R4, tab 52 at 1-2). According to the report, the COR

6

requested more manpower from Sungjee and believed Sungjee was behind schedule by about three months (*id.* at 1).

19. On February 12, 2018, Sungjee's contract manager responded to the government's show cause letter and stated that it was sorry it did not meet the CCD and that it did "not have any excuses on this" and that it "fully understand[s] The Government's side and admit[s] that the delay for the construction is all of [the] contractor's fault" and that the contractor was confused about the Army's "management system" (R4, tab 55 at 1). Sungjee asked to complete the project and included a revised schedule showing a completion date of April 9, 2018 (*id.* at 1, tab 65 at 3). In addition, Sungjee stated it would "happily perform" additional activities as "the penalty of delay," which included installing new doorknobs, replacing gypsum wall board, and "[s]toring and install[ing] furniture and appliances" (R4, tab 55 at 1-2). Here, we find credible Sungjee's admission by its contract manager that it caused the delay through this period, that it had no excuses, and that in return for an extension of time, it would perform additional work, including storing and installing furniture and appliances. And Sungjee told the government it could complete the project in less than two months (*see* R4, tab 65 at 3).

20. On February 19, 2018, the contract specialist requested Sungjee perform additional consideration work such as bike rack cleaning and repairs, installation of a new trash shelter, epoxy coating in outside stairwells, sidewalk repairs, and construction repairs (app. supp. R4, tab 19 at 1). Sungjee mostly agreed to this work, with some caveats (app. supp. R4, tab 20 at 1).

21. Work continued in late February. According to Sungjee's contractor reports, its manpower included the project manager, quality control manager, safety engineer, electricians, carpenters, painters, duct workers, tile workers, and laborers (R4, tabs 56, 58-59, 61-62). On February 20, 2018, the contractor's report stated that 22 workers were on site that day, although, on February 25, a contractor report stated that no construction activities were performed (R4, tabs 56 at 2, 60 at 1). In comparison, the COR's report for February 2018, stated that Sungjee would not finish per the extension request, and the workers were smoking in the dormitory, leaving the dormitory unsecured, and leaving lights on and windows open after work hours (R4, tab 63 at 1-2). The COR did not believe there was sufficient manpower to complete the project (*id.* at 2).

22. Work on the project dwindled in early March. On March 8, 2018, Sungjee submitted an application for base access, with escort privileges, for the quality control manager (app. supp. R4, tab 21). The next week, on March 13, 2018, the Chief of Project Management emailed the contracting officer and stated that Sungjee failed to adhere to the critical path after the show cause/cure notice was

issued in February and that only four workers were on site for a project that needed 12-15 to be completed by April 9, 2018. Further, there was concern that the quality control manager and project manager were rarely on-site. (R4, tab 64 at 1)

*The First Suspension of Work Order*

23. On March 14, 2018, the contracting officer issued a suspension of work order explaining that Sungjee "shall cease all services and the ordering of supplies in support" of the task order (R4, tab 65 at 3-4). According to the order, Sungjee provided no excuse for the delay in response to the show cause letter, and "continue[d] to exhibit the same lack of overall manpower and absenteeism related to the Project Foreman and Quality Assurance Manager as noted in the show cause notice," and was at least one week behind its proposed, revised schedule (R4, tab 66 at 1). In a response the same day, Sungjee stated it disagreed with the suspension order; could finish the work by March 30, 2018; that the only work left was installation of wood trim, toilets, first-floor carpet, and vinyl composite tile (VCT), and rubber tiles; and that Sungjee had requested a time extension in exchange for performance of additional work, but the government never responded. At this time, Sungjee claimed it could complete the project in less than three weeks. (R4, tab 65 at 3) And again, Sungjee agreed to perform additional work for a time extension and wanted a response from the government on its offer (*id.*).

*The Suspension of Work Order Was Lifted Two Days Later*

24. On March 16, 2018, the contracting officer lifted the order and stated that, as agreed, the project must be completed by April 9, 2018, and that Sungjee must perform $100,000 of additional work as consideration (not inclusive of work already agreed upon). The contracting officer also stated that it needed the cell phone numbers of the project manager and quality assurance individual, there would be no smoking in the buildings, lights would be turned off at the end of the day, and Sungjee was to provide daily reports to the COR. (R4, tab 65 at 2)

25. In an email dated March 18, 2018, Sungjee agreed to all the contracting officer's conditions (R4, tab 68 at 4-5). Sungjee also stated it understood the government would issue a modification for a new CCD and lift the suspension of work order once the government and Sungjee agreed to the additional consideration work (*id.* at 5). Sungjee further stated that it "[u]nderstood and agreed completely" with the consideration of $100,000 additional work (*id.*; app. supp. R4, tab 28 at 1-2).

26. The next day, the contracting officer emailed Sungjee and clarified that a new schedule was required showing a completion date around April 9, 2018, and the additional work as consideration for the extension would be minor projects or

performed outside of the building so that the building could be occupied by the April date.  The contracting officer also stated that the additional work would be separately negotiated and that was why the government already lifted the suspension of work order.  (R4, tab 68 at 3-4)  Sungjee ultimately informed the contracting officer that while it thought it could finish by March 30, its subcontractor checked the schedule for realism and now the pre-final inspection would not occur until April 19, 2018; although the suspension of work lasted only two days, the subcontractor's employees left for another job; and it "was all [Sungjee's] fault since we did not check the last schedule properly" (*id.* at 1-2).  At this point, Sungjee needed another extension but was claiming the project could be completed in four weeks.

*Request for Base Passes*

27.  According to an email dated March 21, 2018, Sungjee informed the COR that its base passes had expired, and Sungjee hired a Korean national to escort individuals onto the base.  The COR requested a copy of Sungjee's base passes and asked who was escorting the individuals and why Sungjee did not renew any base passes until now.  (App. supp. R4, tab 33 at 1)  In response, Sungjee stated:

> Currently there is no one who has base [p]ass since the original contract . . . expire[d] on Oct of last year.
>
> Our workers who had [] the pass from this contract ha[ve] turned in [their] pass to the pass department, I think.
>
> *Since the delay on CCD is all our fault, we did not ask [for] the renew of [the] base pass.*
>
> So, we hired [a Korean national] who has [an] escort pass . . . .
>
> We have not been saying or requesting anything for the renewal of pass[es] since the dealy [sic] on CCD is all our fault.
>
> We have been thinking we deserve for [] extra money for the escorting.
>
> Despite [] the fact, [currently], we have serious financial problem.  We [paid] to our subcontractor more money than [] received from the Government and paid off the Off-shore material, the personnel who ha[ve] been hired by us is so

9

busy these days that they could only show up around 0800AM.

At that time the Doduri gate is packed with construction people. To get escort, we have to wait around one or two hours.

(App. supp. R4, tab 33 at 2)(emphasis added). It appears Sungjee then submitted applications for passes for several individuals, including the project manager, in late March 2018 (*id.*; app. supp. R4, tabs 34, 42 at 8). On April 5, 2018, the COR informed Sungjee the passes were rejected due to insufficient information, *i.e.*, missing employment letters and two copies of identification cards for each individual (app. supp. R4, tab 35). We find that Sungjee failed to request base passes for almost all of its employees from at least October 2017 through March 2018 because it believed the delay was its fault, and somehow that meant it could not request passes, and that Sungjee did not hold the government responsible for its failure to obtain base passes. Further, while Sungjee submitted pass requests in late March 2018, the applications were defective, and any delay in obtaining passes was Sungjee's fault.

28. A COR daily inspection report dated March 22, 2018, stated the contractor's workforce consisted of eight individuals; however, three of those individuals were managers (R4, tab 69 at 1). A contractor daily report for March 31, 2018, stated that nine employees were present, and that 93.3 percent of the total job was complete; of the nine employees, two were managers and one was a safety engineer (R4, tab 71 at 1-2). Meanwhile, a COR monthly report for March 2018 stated that Sungjee's work was unsatisfactory, the contractor was failing to maintain manpower, the project was behind, workers were smoking in the dormitory and leaving it unsecured after work hours as well as leaving lights on and windows open (R4, tab 70).

*And the Government Provides Another Extension*

29. In the meantime, the government evaluated the additional work that Sungjee could perform as consideration for the extensions granted (R4, tab 72). It is unclear why the government believed Sungjee could perform this additional work when Sungjee could not even complete the repair work required by the task order. Nonetheless, on April 9, 2018, the Army requested Sungjee provide a timeline in which to complete the following additional work: converting two existing storage rooms to laundry rooms; removing the existing bicycle rack and installing a new one; removing the existing gazebo and installing a new one; replacing damaged steel plate covers; and working on a concrete sidewalk (R4, tab 73 at 2-3). On April 12, 2018, Sungjee agreed to complete the additional work, with a few caveats, as consideration for a revised CCD (*id.* at 2).

10

30. Despite all the promises by Sungjee about the final completion of the project, a COR monthly report for the period ending April 2018 stated: "Manpower is still low despite base pass renewal. Another extension for June 2018" (R4, tab 75 at 1).

31. Sungjee's schedule supported the COR's conclusions. Sungjee's schedule, dated April 24, 2018, showed a pre-final inspection date of May 28, 2018, with the following work to be completed: landscaping, asphalt, quarry tile at the stairs and washing rooms, installation of door and toilet accessories, installation of wood trim, placing of VCT, painting, installation of plumbing and lighting fixtures, communication systems work, and fire alarm work including testing (app. supp. R4, tab 40 at 12). Ironically, back on March 14, Sungjee told the government that the only work left was the installation of wood trim, toilets, first-floor carpet and VCT, and rubber tiles, and it could complete the project in less than three weeks. Now, a month and a half later, Sungjee still needed to complete at least some of the same work but now needed another four weeks. We find questionable Sungjee's schedules as well as its contractor reports claiming the percentage of work completed. Meanwhile, Sungjee's schedule also showed June 26, 2018, as the completion date for the consideration work (*id.* at 15).

32. On April 24, 2018, the contracting officer emailed the following to Sungjee: "As discussed, I have approved an extension for handover for occupancy of the building NLT 15 June 2018 with completion of consideration work 31 July 2018[.]" The contracting officer also stated that consideration would be up to $150,000 in additional repair work at the government's sole discretion, any "further delays will face additional consideration amounts or possible Termination for Default," and Sungjee was to notify the office of any delay immediately. (R4, tab 74 at 1) Although the contracting officer did not issue a formal modification to the contract, he informed Sungjee in writing that the CCD was extended (*id.*).

33. On May 2, 2018, Sungjee informed the COR that it had not yet received the passes for the workers and staff, and the pass department stated they would be ready by May 14. Sungjee was worried that due to the lack of escort privileges, the manpower on the site was insufficient. (App. supp. R4, tab 42 at 1) Only two days later, the COR informed Sungjee that six passes were ready for pick up (*id.* at 6). At this time, the contracting officer had modified the CCD through June/July 2018 via email, and passes were approved even though no other signed modification was issued on the order.

34. Meanwhile, according to Sungjee's own Contractor's Quality Control Report, dated May 19, 2018, it had completed 96.5 percent of the project (R4, tab 76 at 1). This would mean it had to complete only 3.5 percent of the work by the occupancy CCD of June 15, 2018. And yet, Sungjee failed to do so.

11

35. On May 22, 2018, the COR emailed Sungjee and stated the project would not finish on time with only two workers a day and that the government "revalidated your base passes and other workers could be transferred from the PAX Terminal project during construction down time. If manpower continues to be like this, I foresee another slip in the schedule." At this time, the CCD was still June 15, 2018. (App. supp. R4, tab 45 at 1) Despite receiving the requested base passes, Sungjee had only a few workers on the project.

36. On June 5, 2018, the government issued a contract deficiency report (CDR) to Sungjee stating, in part, that Sungjee installed doors that were not fire rated in accordance with the specifications. There were also issues with the quality control manager. (R4, tab 81 at 1)

37. Sungjee requested passes on June 8, 2018, for the project manager, quality control manager, structure foreman, and civil team foreman (R4, tab 85 at 1). Both the project manager and quality control manager sought escort privileges for three individuals each through September 30, 2018 (R4, tab 85 at 2-3, 6-7). The application noted that performance on the order ended June 30, 2018 (*id.* at 4, 8, 12, 16). The individuals had passes through June 30, 2018 (*id.* at 5, 9, 13, 17).

38. According to a COR report for June 2018, the government issued CDRs, there was "no manpower," and another contract extension was needed (R4, tab 90). On June 14, 2018, Sungjee submitted a corrective action plan in response to the government-issued CDRs (R4, tab 87). Sungjee concurred with the CDRs, including that the doors were not fire-rated because it "failed to check the materials before installation," however, Sungjee would contact the manufacturer to try and resolve the issue. (*Id.* at 2-3).

39. On June 25, 2018, ten days after the occupancy CCD expired and five days before some of the base passes were to expire, Sungjee emailed the COR a new schedule and stated it needed the passes for its workers since it could not afford to pay additional money to just come into the camp anymore (app. supp. R4, tab 49 at 1). The revised schedule showed a completion date of September 15, 2018 (*id.*, app. supp. R4, tab 48 at 2). In response, the COR stated that the submitted passes "were invalid due to contract completion dates and numbers. We need new base forms submitted with the new projected contract completion date" as well as official letters for each employee stating Sungjee hired them for the project (app. supp. R4, tab 49 at 1). And the next day, the government emailed Sungjee an attachment and stated that all new base pass applications needed to be submitted on the correct form (*id.*, tab 50 at 1). Further, the COR expressed concern with missing items on the schedule. The COR wanted a detailed schedule

so the government could get "an honest timeline of when the project will finish." (*Id.*, app. supp. R4, tab 49 at 2)

40. A revised contractor schedule dated June 29, 2018, showed a start date of July 1, a new CCD of September 29, 2019, for the project, and completion of the consideration work in mid-September (app. supp. R4, tab 56 at 2, 6). In other words, Sungjee claimed it would take three months to complete the work. This schedule included the following work elements: landscaping; quarry tile at the stairs and washing rooms; installation of toilet and door accessories; removal work of installed tile and reinstallation in the kitchen; removal and fill work on a window frame; installation of wood trim; removal of wet carpet and VCT; replacement of mirror glass; placing VCT and baseboard; removal work of applied paint on the handrail and fixing steps; installation of rubber tiles on the stairs; tile work in the bathroom; painting; installation of plumbing and lighting fixtures; communication system work; removal work on installed switches for fan system; installation of conduit pipes; wiring work; installation of receptacle cover; fire alarm work and testing (*id.* at 2-3).

41. On July 3, 2018, the COR requested a new progress schedule and again stated that it still needed base pass renewal applications on the newest form sent (app. supp. R4, tab 57 at 1). On that same day, Sungjee submitted a sample pass to the COR for review, stating that "[i]f the file is OK, we would submit by next [T]uesday." In response, on July 11, 2018, the COR informed Sungjee that it needed to change the date to "Oct 2018." (App. supp. R4, tab 50 at 3) Again, no formal modification was required for base passes to be issued. Further, the government had to remind Sungjee to submit the applications on the new form rather than Sungjee immediately doing so.

42. On July 16, 2018, the COR told Sungjee to submit a time extension request letter and stated he was "still waiting on base passes and a new project schedule." On that same day, Sungjee responded that it did not have enough money to complete the project and would submit a request for an extension of time soon. Sungjee also stated that it was "sorry for the delay due to our financial problem" and that its quality control manager would pick up the submitted passes that day. Sungjee also stated that it would re-submit pass applications by July 23, 2018, because it was obtaining more workers to complete the project, which meant they would need more passes. (App. supp. R4, tab 58 at 1) We find the issuance of base passes was not the cause of the delay here as Sungjee has admitted that through July 2018, it caused the delay, and the cause was mainly due to insufficient finances and staff to complete the project.

43. On July 19, 2018, the COR informed Sungjee it would terminate the order for default for Sungjee's failure to complete the project. Sungjee responded

that it was willing to complete the project and had the financial capability. (App. supp. R4, tab 61 at 1) We find Sungjee's claim it now had the financial means to complete the project inconsistent, at best, with its prior statements (made only three days earlier) that it did not have sufficient funds.

44. On July 25, 2018, Sungjee's contract manager requested the "opportunity to complete [the] project" despite the fact it had missed the CCD several times. Sungjee explained it was experiencing "serious financial problem[s]" and its financial capital was frozen for six months, and that it "feel[s] very sorry not to keep [the] CCD on this project for our financial problem[s]." (R4, tab 92 at 1) The letter concludes with the following:

> We admit all of the happening[s] for B.929 project is our fault. And, for [] our reputation, pride and promise with U.S government, if we would get another chance, we are trying to do our best to complete B.929 project.

(*Id*. at 2). For at least the third time, Sungjee admitted fault for failure to meet the project completion date, and it was generally because Sungjee was experiencing serious financial problems.

45. According to an internal government email, there was a meeting with Sungjee on July 26, 2018. Sungjee's project manager and quality control manager were present and admitted to having financial issues since January 2017. Sungjee further stated they believed they were 80 percent complete (or 70 percent complete if they needed to replace the doors/frames), and the COR agreed. Sungjee presented a schedule to complete the remaining contract work by October 20 with a start date of August 1 and stated that $60,000 was needed to complete the work. The internal email also stated that the contractor had "not processed any base passes since the beginning of Jun[e]" and the timeline for new base passes was about 1 to 1.5 months. (R4, tab 93 at 1)

46. Further, according to the email, the government informed Sungjee that it needed to provide the following: letters from the door and frame manufacturer stating the materials were fire-rated or replacements; a new and realistic schedule that included all the rework; a cost estimate for the remaining work; the manpower needed; a clearly defined critical path; a plan for the mold remediation; and base pass applications for all required workers. Once that information was submitted by July 31, 2018, the contracting officer would decide the path forward and either terminate Sungjee for default or establish a new period of performance. The email also explained a new contracting officer was on board, and the government was concerned with the four extensions already provided (including the most recent one to June 15), that Sungjee had

14

not worked in the building since June 6, and Sungjee's work resulted in flooding and inoperable air conditioning which resulted in mold.  (R4, tab 93 at 2)

47.  We find the meeting minutes set forth in this email consistent generally with the record and occurrences during this project.

48.  On July 31, 2018, Sungjee provided letters from the door frame manufacturer concerning the fire rating (R4, tab 98 at 3).  Sungjee also submitted a project schedule estimating 1290 manpower hours to complete the work by November 25 (with the work beginning August 1), or almost four months.  The project schedule showed the following work elements:  landscaping; mold control; removal work on wet carpet and VCT; removal work and fill for window frames; installation of quarry tile at the stairs and washing rooms; removal of deficient tile; ordering and fabrication of tile; gypsum wallboard work and installation of tile; installation of toilet and door accessories and wood trim; replacement of mirror glass; placement of VCT and baseboard; removal of paint on handrail and steps; placement of rubber tiles on the stairs; other painting; installation of plumbing and lighting fixtures; communication systems work; installation of receptacle cover; fire alarm work and testing.  (App. supp. R4, tab 64 at 14)

*And Another Extension to the Schedule*

49.  The government issued bilateral Modification No. 003, effective July 27, 2018, to extend the CCD to August 31, 2018, "resulting from the meeting with the [contractor] on 26 Jul 2018."  The modification states:  "In return for the CCD extension, the contractor agrees to release the Government from any claims related to this extension.  All other terms and conditions remain unchanged."  (R4, tab 95 at 1) Based upon the July 26, 2018 meeting minutes, we find one purpose of the extension was to acquire further information from Sungjee, such as a realistic schedule and sufficient base pass applications, to assess a path forward and decide Sungjee's ability to complete the project.

50.  At this point, Sungjee admitted several times that the failure to meet the CCD was all its fault, mainly due to the company's financial issues.  Sungjee constantly asked to finish the project despite missing several deadlines and agreed to perform additional work as consideration for the extensions.  And as noted, Sungjee signed the bilateral modification.  We find nothing in the record shows that Sungjee was forced to sign the modification because of a coercive and pressured atmosphere.

*The Contract Specialist Tells Sungjee Not to Do Anything Further at the Site*

51.  On August 2, 2018, the contract specialist informed Sungjee, via email, not to "do anything at [the] site until you are told to do so by the 411th CSB" and to submit a progress schedule using a critical path model that day (R4, tab 97 at 2).  The next day, the COR emailed the Chief of Contracting and stated that Sungjee provided the required information regarding the door and door frames and fire rating but should be terminated for failing repeatedly to finish the project, and there was concern over Sungjee's financial situation (R4, tab 98 at 1).  At this point, Sungjee "provided verification from the manufacturers that the doors and frames were compliant" (R4, tabs 88, 91).  Therefore, Sungjee verified that the doors and frames met the task order's specifications.

52.  On August 8, 2018, the contract specialist requested Sungjee submit an updated progress schedule using a start date of October 1, 2018.  The contract specialist also requested financial statements to verify Sungjee's willingness and intent to complete the project.  In addition, Sungjee was to submit base pass documentation no later than August 31, 2018.  (R4, tab 143 at 1; app. supp. R4, tab 68 at 1)  We find that regardless of the contract specialist's email to not do anything on site, Sungjee was told to provide base pass applications and a schedule.  Further, we find that Sungjee failed to submit valid base applications before August 31 despite being reminded and asked to do so.  And finally, even if the contract specialist had not told Sungjee to cease work, Sungjee would not have completed the project by August 31 as its July 31, 2018 project schedule showed a completion date of November 25.

53.  Sungjee submitted a revised schedule on August 21, 2018, showing a start date of October 1 and a new completion date of January 25, 2019.  This means Sungjee anticipated it would take four months to complete the following work: restoration/landscaping; quarry tile at the stairs and washing rooms; installation of door accessories/toilet accessories; removal of installed tile; installation of gypsum wallboard and tile in kitchen; installation of wood trim; placement of VCT including baseboard; other painting; installation of plumbing and lighting fixtures; communication systems work; installation of receptacle cover; and fire alarm work and testing.  (App. supp. R4, tab 70 at 1-2)  Upon review, the contract specialist believed the schedule did not show the critical path for network analysis as required by the specifications (app. supp. R4, tab 71 at 2).  Upon our review, we find that this schedule contained most of the same work as the one provided on June 29, where Sungjee stated it would take only three months to complete the work.  Again, Sungjee's schedules were unreliable, and we do not believe Sungjee knew when it could complete the work.  At this time, the contracting officer requested a meeting with Sungjee because work was at a standstill, no progress had been made, and the contractor failed to meet the CCD (*id.* at 1).

54. On August 22, 2018, the COR requested the location of the stored furniture and a checklist or inventory of the items (app. supp. R4, tab 69 at 1). The COR asked for this information again on September 5, 2018 (*id.* at 2). On September 12, 2018, Sungjee provided a list of 11 furniture items being stored and stated it could not contact the owner of the storage facility to obtain an address (*id.* at 3).

55. On August 28, 2018, a government construction inspector notified several individuals that he had reviewed Sungjee's quality control plan and found that "two of their employees had submitted fraudulent Engineer Architecture Certifications" because they were not certified through the Engineer Architecture program of Korea. One of the individuals verbally admitted he submitted fraudulent credentials to the government and then sent a text apologizing for the fraudulent paperwork. (R4, tab 145) On that same day, Sungjee informed the government that it "falsfied (sic) QC plan. In the QC plan, we falsfied [sic] certifications. It is all contractor's fault. And, we are willing take all responsibilities" (R4, tab 146).

*The Second Show Cause Notice*

56. On August 31, 2018, the contracting officer issued another show cause notice stating that since Sungjee failed to perform within the required time set forth in the order, or "cure the conditions endangering performance," the government may terminate the order for default (app. supp. R4, tab 72 at 3). On September 4, 2018, Sungjee responded to the show cause letter and stated the following as the cause of the delay:

> 1. From 2018[/]01 to 2018[/]04 : Sungjee's sub-contractor has dropped out of the project for the financial problem even though Sungjee paid more money to them compare[d] to working progress.
>
> Sungjee tried to find another sub-contractor. Yet, it was very hard to find another sub- contractor.
>
> 2. From 2018[/]05 to 2018[/]07 : Sungjee had been trying to clear the CDR from QA. Sungjee's main concern on the CDR was door problem. So, Sungjee had sent one of employee to the United States to check regarding the door and submitted official letter from manufacturer to the Government.
>
> 3. From 2018[/]08 to present: Sungjee has gotten E-mail from the Government not to proceed any construction activities before the Government's direction.

17

(app. supp. R4, tab 73 at 3).  Sungjee never claims it failed to meet the CCD because the government did not issue timely base passes.

57.  In an internal email dated September 6, 2018, the government memorialized a meeting held that day with Sungjee.  According to the email, several ongoing issues were discussed, including:

> - Lack of Manpower - Only 2-3 personnel on site
> - Lack of Work - Workers on site engaged in various non-
> work tasks (sleeping, using phones, [etc.])
> - No Effort to Ensure Base Access - No new passes have
> been submitted since May
> - No Qualified QC Manager - QCM is not appropriately
> licensed
> - Payment - 411th has received complaints that
> subcontractors for Sungjee have not been paid
> - Mold Issue - Mold is still growing in the building and no
> attempt has been made to mitigate it
> - Status of Consideration Work - Contractor has made no
> attempt to complete the 6 projects that they agreed to
> complete for consideration work

(R4, tab 102 at 2-3).  According to the government, Sungjee agreed to submit a critical path model, all required base access pass applications, a listing of all stored government furnishings and location, and the name of a new quality control manager by September 8 or 12, 2018.  In addition, Sungjee's senior director agreed to request base access to make periodic visits, guaranteed the project would be completed, and stated that at least $300,000 would be required to complete the work, and the company had financial security.  The government informed Sungjee that if these "stipulations" were not met, it would terminate the task order for default.  (*Id.* at 3)  We have no basis to question the veracity of this memorandum.

58.  Sungjee submitted a timeline chart schedule showing the critical path.  The schedule was sparse.  For example, for construction work it showed only restoration, installation of door/toilet accessories, removal work on installed tile, putty work, painting work and site cleaning.  The schedule stated that Sungjee needed 167 days, or approximately 5.5 months, to complete the work.  (App. supp. R4, tab 77 at 2)

59.  On September 10, 2018, Sungjee informed the contracting officer that it would submit at least eight pass applications in the next two days after notification of a new completion date.  In this regard, Sungjee stated that it believed the completion date for the passes was October 2018, but Sungjee's new schedule showed that it

would need more time to complete the work and asked which date it should use (R4, tab 103 at 1-2). Via separate email, Sungjee also proposed replacements for its project manager and quality control manager (R4, tab 101 at 1). In response, the contracting officer informed Sungjee and others that it needed to verify the licenses for the two new individuals, review the new schedule and determine the end date of any extension. Only after those items were accomplished would the government "look at passes." (R4, tab 103 at 1)

60. On September 12, 2018, the COR concluded that Sungjee's schedule was vague and lacking in many line items (R4, tab 104 at 1). The COR also concluded that the request for only eight base passes represented an insufficient workforce to complete the project because at least 15-20 individuals were needed to finish the job in 50 days. Further, the Army needed hard copies of the base pass applications, and therefore Sungjee's email submission was insufficient, and "this busts our request date [of September 8] of base passes." (*Id.* at 2)

61. The next day, the contract specialist, a licensed construction engineer, reviewed the schedule and concluded that the overall duration was 167 days and tasks were missing. For example, the stairs in the building were still bare concrete and needed a final finish with rubber tiles, and the entrance floor needed quarry tiles, but these tasks were not on the progress schedule. (R4, tab 107 at 1)

62. On September 19, 2018, the contracting officer notified Sungjee that it failed to meet the requirements for an extension as discussed during the September 6, 2018 meeting. Specifically, Sungjee failed to: provide a critical path method (CPM) showing the consideration work, rework, and manpower; submit all required base pass applications by the due date; inform the government of its subcontractors; provide the location of the furniture storage; and propose a qualified quality control manager (R4, tab 109 at 1). The contracting officer stated it had previously advised Sungjee that if these stipulations were not met, he would terminate the contract for default (*id.* at 2). In response, Sungjee stated it would appoint a project manager and quality control manager, has hired some subcontractors with passes, requested a CCD for pass applications and was awaiting a response, and misunderstood the requirement for the CPM to include consideration work. Sungjee believed it could submit manpower after the CPM was reviewed. Sungjee further stated that it was willing and had the financial capacity to complete the project. (R4, tab 163) Sungjee's response confirms that it submitted an inadequate CPM. For example, even if Sungjee believed consideration work was not to be included, Sungjee does not explain sufficiently why the rework or manpower was excluded. In addition, Sungjee may have hired subcontractors but failed to identify them to the government. And Sungjee never provided a response on the location of the stored government furnishings.

*The Final Suspension of Work Order is Issued*

63. On September 20, 2018, the contracting officer issued a suspension of work order (R4, tab 110 at 2-3). The order instructed Sungjee to "[i]mmediately stop all work, and place no further orders. Provide by electronic means similar instructions to all subcontractors and suppliers" (*id.* at 3).

64. On November 22, 2018, Sungjee emailed the contracting specialist and stated that they have been on the site almost every day since the September 6, 2018, meeting, even though they do not have passes, and they have been working on the mold problem, which was almost fixed. Sungjee also stated it performed water pressure testing on the newly installed sprinkler line. (App. supp. R4, tab 84 at 1) According to Sungjee's quality control manager, by May 19, 2018, it had completed 96.5 percent of the project (R4, tab 76). Yet, six months later, despite Sungjee saying it kept working *after* a stop work order had been issued and with no base passes, it had still not completed the project.

*The Termination for Default*

65. On December 20, 2018, a newly assigned contracting officer issued a memorandum for the record stating that the task order would be terminated for default for the following reasons: (1) as of December 15, 2018, Sungjee had completed only 72.7 percent of the project work and offered multiple excuses, none of which were outside the company's control; (2) uncompleted work included the installation of underground rain pipes and surface inlets, removal and reinstallation of concrete sidewalk and curbs, installation of hardware for all interior and exterior doors, testing/adjusting/balancing on HVAC and plumbing systems, pipe cleaning for all HVAC systems, and pipe cleaning for all potable water pipework; (3) the building was designated as housing for military officers and at the time of termination, there was no reasonable estimated time for the project completion; and (4) Sungjee had been paid 70 percent of the value of the contract work (R4, tab 112). That same day, the government issued Modification No. 04, terminating the task order for default pursuant to FAR 52.249-10, DEFAULT (FIXED PRICE CONSTRUCTION) (R4, tab 113). According to the termination notice to Sungjee, the government terminated the task order for the following reason:

> Failing to complete all work within the Statement of Work and Drawings in accordance with terms and conditions of the contract order by the Contract Completion Date and numerous extensions.

The contracting officer concluded the failure to perform was not excusable. (App. supp. R4, tab 86 at 4)

66. On December 21, 2018, the government project engineer provided a "rough" estimate of the total amount of work completed for each section of the statement of work (R4, tab 114). According to the estimate, the following amount of work had been completed: architectural work (75 percent), civil work (40 percent), mechanical work (90 percent), and electrical work (90 percent) (R4, tab 115).

67. At the time of termination, Sungjee had submitted seven requests for payment, setting forth the total work it believed it had completed on the project and the period of performance for that work (R4, tabs 19, 23-25, 27, 31, 37). By November 15, 2017, Sungjee stated it had performed 72.7 percent of the work (R4, tab 37). Sungjee relies on its own contractor daily reports, which are inconsistent with the government's reports and facts set forth above and we therefore find unreliable, to claim that by May 19, 2018, it had completed 96.5 percent of the work, despite allegations that not having base passes prevented them from working (R4, tabs 56, 58-62, 71, 76).

68. A review of the photographic evidence in the record shows some completed work. However, the photos also show an uninhabitable building--lighting fixtures dangling from the ceiling, unpainted/unfinished walls, incomplete floors, incomplete tile work, etc. (*see e.g.*, app. supp. R4, tab 91). In addition, these pictures do not provide evidence that the mold issue was remediated or that the electrical, mechanical, or alarm systems were functioning. Further, Sungjee's assertion that it had completed 96.5 percent of the work is inconsistent with Sungjee's own August 2018 schedule showing it needed 167 days to complete the project. Therefore, we find Sungjee has failed to show that it completed 96.5 percent of the work.

69. At the time of termination, the government had assigned at least three CORs, one contract specialist, and four contracting officers to the task order (*see* R4, tabs 5, 65, 93, 112, 125, 164). While the management of the project was less than perfect, we nonetheless find no evidence in the record that the changes in government personnel managing the task order impacted the progress of or schedule for the project.

70. In January 2019, Sungjee submitted a proposal to the government seeking $1,126,581,736 Korean won from the government (app. supp. R4, tab 88 at 5).

*Claims and Appeals*

71. On March 18, 2019, Sungjee filed a notice of appeal regarding the termination with the Board, which was docketed as ASBCA No. 62002. On April 30, 2019, Sungjee filed its complaint, arguing that the termination was improper because the government: (1) failed to turn over the site on time which contributed to the delay; (2) failed to monitor and supervise timely issuance of passes and automobile decals for base access; (3) gave oral extensions of time rather than written modifications; (4)

inefficiently managed the government furnished government installed (GFGI) items; (5) pressured Sungjee to provide free work in exchange for extensions of time; (6) gave Sungjee a stop work order on August 2, 2018, which was not lifted until the date of termination; (7) issued a show cause notice on August 31, 2018, and Sungjee responded but never received a decision from the government on the response; (8) inefficiently managed the contract due to frequent changes of management personnel; and (9) arbitrarily rejected 80 door frames (compl. at 4-5). The complaint requested a monetary sum, despite recognizing the Board lacked jurisdiction over the claim for money as it was never submitted to the contracting officer for a decision (compl. at 2, 12-13).

72. On July 12, 2019, Sungjee submitted a claim to the contracting officer stating that the termination for default should be converted to a termination for convenience for the same reasons as set forth in its complaint with the Board (R4, tab 166 at 1). In addition, the claim stated that Sungjee was seeking a sum certain for work performed on the contract (₩1,130,241,196 won), transportation and storage fees of appliances, which were GFGI (₩12,376,000 won), storage fees of furniture which were also GFGI (₩101,750,000 won), and additional work provided free of charge (installation of electrical conduit and outlets, waterproofing of bathrooms) which should have been taken care of as change orders (₩79,922,660 won) (*id.* at 1-2).

73. Sungjee claims that it incurred storage fees for the furniture from March 1, 2018, through June 30, 2019 (app. br. at 24). However, on May 17, 2019, a furniture company emailed the government and stated it would keep the stored furniture at no cost to the government until a delivery date could be established. The company also stated that Sungjee only paid three months of storage fees. (R4, tab 116 at 1)

74. On July 30, 2019, the Board dismissed, in part, Sungjee's appeal. Specifically, the Board dismissed the portion of ASBCA No. 62002 relating to the appellant's monetary claim, leaving only the propriety of the default termination before the Board. *Sungjee Constr., Ltd.*, ASBCA Nos. 62002, 62078, 2019 WL 3842481 (July 30, 2019).

75. The government issued a contracting officer's final decision (COFD) on August 20, 2019, denying the monetary claim in part. According to the COFD, Sungjee sought $1,138,670.80. (R4, tab 167 at 1) The government already paid Sungjee $2,724,205.64 of the total fixed-priced award amount of $3,776,769.67. The government paid this amount based on progress payment requests submitted by the company and approved by the Government for the completion of 72.1 percent of the work. The government stated it would pay $83,152.56 because during a meeting, the government and Sungjee both agreed that Sungjee had completed 80 percent of the task order work and the amount due was the delta between what was paid already and the agreed upon completed work at termination. The government stated it would not

22

pay for storing furniture and appliances because Sungjee never informed the government of this in its response to the show cause notice or request for equitable adjustment. (*Id.* at 2) Finally, the government denied the request for money for the installation of electrical conduit and outlets due to a supplemental agreement (Modification No. 03) where the government stated Sungjee released it from any claims relating to the extension (*id.* at 2-3).

76. On September 9, 2019, Sungjee filed its notice of appeal/complaint on this COFD, which the Board docketed as ASBCA No. 62170. The Board later consolidated the appeals and issued an order stating that the Rule 11 briefs would address entitlement only.

<u>DECISION</u>

As noted, the parties requested a decision pursuant to Board Rule 11(a), which permits parties "to waive a hearing and to submit [their] case upon the record." Board Rule 11(d) explains that "[t]he weight to be given to any evidence will rest within the discretion of the Board" and therefore allows the Board to "make findings of fact on disputed facts." *U.S. Coatings Specialties & Supplies, LLC*, ASBCA No. 58245, 20-1 BCA ¶ 37,702 at 183,031 (citation omitted). In addition, Board Rule 11 specifically states: "Submission of a case without hearing does not relieve the parties from the necessity of proving the facts supporting their allegations or defenses."

In its brief, Sungjee asserts only two issues on the appeal: (1) whether the default termination was arbitrary, capricious, and issued in bad faith; and (2) whether the government should be held liable for the monetary loss and damages Sungjee incurred as a result of the improper termination (app. br. at 2). The government asserts the default termination was reasonable and supported by the record, and Sungjee failed to establish the reasonableness of its entitlement to money (gov't reply at 1).

*The Government's Default Termination was Justified*

A termination for default is a government claim. *Securiforce Int'l Am., LLC v. United States*, 879 F.3d 1354, 1363 (Fed. Cir. 2018). Therefore, the government bears the burden to prove that its termination was justified. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987); *Cascade Designs, Inc.*, ASBCA No. 62378, 22-1 BCA ¶ 38,068 at 184,843. In addition, we note at the outset that a termination for default is "a drastic sanction," and it "should be imposed (or sustained) only for good grounds and on solid evidence." *Lisbon Contractors*, 828 F.2d at 761.

The legal standards for a default termination are well established. Pursuant to the relevant default clause, in this appeal FAR 52.249-10, DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984), the government may terminate a contract for default

23

when: (1) "the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension," or (2) "fails to complete the work within this time." FAR 52.249-10(a). A termination for failure to make progress generally occurs prior to a contractual deadline, and a termination for failure to meet the contractual deadline occurs after the deadline. *Abcon Assocs., Inc. v. United States*, 44 Fed. Cl. 625, 631 (1999) (citations omitted).

In this appeal, there were several extensions and the last CCD, set by a bilateral modification, was August 31, 2018. In this regard, we have explained that:

> It is well established that the "action of the parties in agreeing upon a new delivery schedule eliminates from consideration the causes of delay occurring prior to such agreement." *E.g.*, *RFI Shield-Rooms*, ASBCA No. 17374, 77-2 BCA ¶ 12,714 at 61,731. "In establishing a new delivery date, the parties agree to 'let bygones be bygones' and '[a]ny delinquencies on the part of either the contractor or the Government [a]re 'washed out' . . . ." *Environmental Devices, Inc.*, ASBCA No. 37430 *et al.*, 93-3 BCA ¶ 26,138 at 129,934, *quoting Winder Aircraft Corp.*, ASBCA Nos. 4364 and 4733, 58-2 BCA ¶ 2,044 at 8567.

*Sach Sinha and Assocs., Inc.*, ASBCA No. 46916, 96-2 BCA ¶ 28,346 at 141,562-63; *see also Zimcon Pros.*, ASBCA Nos. 49346, 51123, 00-1 BCA ¶ 30,839 at 152,212 (applying this standard to termination for default of contract for replacement of hangar roof); *Precision Dynamics, Inc.*, ASBCA No. 42955, 97-1 BCA ¶ 28,846 at 143,892.

The government terminated the task order because Sungjee failed to complete all the work by the original CCD and numerous extensions. The memorandum supporting the termination noted that Sungjee had only performed 72.7 percent of the project work and offered multiple excuses, there were several items of uncompleted work, and there was no estimated time for project completion, which was problematic because it was needed to house military personnel.

The record shows the appellant failed to meet the initial CCD or any extensions, including the final CCD of August 31. Failure to complete work by the task order deadlines is a well-settled ground for default termination. *See Consolidated Indus., Inc. v. United States*, 195 F.3d 1341, 1344 (Fed. Cir. 1999). We conclude the government has met its burden here that default was warranted for failure to meet the project deadlines.

*No Excusable Delay*

Where the government satisfies its burden of establishing the validity of the default termination, the contractor has the burden of establishing that the default was excusable. *Highland Al Hujaz Co., LTD.*, ASBCA No. 58243, 16-1 BCA ¶ 36,336 at 177,164, *aff'd*, 696 F. App'x. 509 (Fed. Cir. 2017) (per curiam). The relevant FAR default clause explains that a contractor is not to be terminated for default (or charged with damages when terminated) if "[t]he delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor." FAR 52.249-10(b)(1), DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984). Such unforeseeable causes can include government acts, such as whether "the government materially breached the contract[,] thereby discharging appellant's duty to perform." *Highland Al Hujaz Co., LTD.*, 16-1 BCA ¶ 36,336 at 177,164 (citations omitted). Appellant sets forth three main arguments that the government, and not Sungjee, caused the delay here.

*Issuance of Base Passes*

First, appellant argues that the government caused the delay because it failed to issue the base passes in a timely manner (app. br. at 5). Sungjee states that "[e]ven if [it] had timely submitted requests for passes after each expiration," the government would not have issued the passes because there was no valid modification stating a fixed CCD (*id.* at 6). According to Sungjee, when the government failed several times to extend the CCD via written modification, the already-issued passes expired, and the issuance of new passes was not even possible (*id.* at 5). And, finally, according to Sungjee, any passes that the government issued without a formal modification were false, improper, and illegal and should not have been issued (app. br. at 9; app reply at 9).

As set forth above, where the parties agree upon a new delivery schedule, the causes of any delay occurring prior to the agreement are eliminated from consideration. *See Sach Sinha and Associates, Inc., supra*. Regardless, we note that the task order specifically required Sungjee provide all information required for background checks to meet installation access requirements. Therefore, Sungjee was responsible for initiating base pass requests (finding 4). Sungjee was delinquent in requesting passes at the start of the project (finding 6), and it continued from there. In this regard, Sungjee failed to request base passes from October 2017 through March 2018 because it believed the delay was its fault (finding 27). And although Sungjee argues the government failed to renew passes and decals after June 30, 2018, we found that Sungjee failed to submit valid base applications before August 31 despite being told to do so (finding 52).

25

In addition, when Sungjee did provide the government pass applications, they were deficient (*e.g.*, missing information such as completion dates or letters of employment) (finding 27). Further, during performance of the task order, Sungjee did not hold the government responsible for Sungjee's failure to obtain base passes (findings 27, 56).[2] In fact, Sungjee itself admitted that through July 2018, it caused the delay, and the cause was due to insufficient finances and staff to complete the project (findings 42, 44). In addition, even when base passes were issued in May 2018, Sungjee had few workers on the project (finding 35). Based upon these findings, we conclude the government did not fail to issue passes in a timely manner and regardless, Sungjee admitted several times it caused any delay.

We also found that the government issued passes without a formal modification (findings 33, 41). For example, on April 24, 2018, the contracting officer informed Sungjee in writing that the CCD was extended through June 15, 2018, for occupancy and July 31, 2018, for the total project. Pass applications were approved in May 2018 (finding 33). Therefore, we conclude that contrary to Sungjee's assertions, a formal modification to the task order was not required for the issuance of passes.

And while Sungjee argues that issuing passes without a formal modification is improper and illegal (app. br. at 9; app reply at 9), it is unclear how issuing the very passes Sungjee says it requested and required caused it delay. Further, USFK Regulation 190-7 requires the submission of information, such as a memorandum and the contract, and an extension for the approval authority to consider when making a final decision; in other words, the discretion appears to be left to the approving authority.

*Stop Work Orders*

Second, Sungjee argues that it could not perform after the contract specialist's August 2, 2018, email requesting a progress schedule and ordering appellant not to work at the site until told to do so (app. br. at 11). Sungjee contends it stopped work because it tried to cooperate with all government personnel to ensure a good relationship (*id.*). Further, Sungjee states it could not perform any work after the government issued the September 20, 2018 stop work order, which was in effect until December 20, 2018 (*id.*). According to Sungjee, by June 15, 2018, it had completed 96.8 percent of the work (*id.* at 12).

---

[2] Sungjee argues that the government failed to produce documents related to pass applications that Sungjee submitted because such documents were destroyed after one year (per government protocol) (app. br. at 8). This issue was addressed previously in *Sungjee Constr. Co., LTD.*, ASBCA No. 62002, 21-1 BCA ¶ 37,825 at 183,701-702, where we denied Sungjee's motion for sanctions against the government for failure to produce the pass application documents.

The contracting officer, not the contract specialist, issued the first suspension of work order in March 2018 and its rescission two days later. Just a few days prior to the contract specialist's instruction to stop work on the project site in early August, the contracting officer issued a bilateral modification extending the CCD to the end of August. The project's history shows the contracting officer issued stop work orders and modifications, not the contract specialist. And, in fact, the contract (and therefore the task order) included the suspension of work clause (finding 1). This clause provides that only the "Contracting Officer may order the Contractor, in writing, to suspend, delay, or interrupt all or any part of the work." FAR 52.242-14(a).

In addition, a contract administrator or specialist usually lacks authority to order a contractor to suspend work. *Precision Dynamics, Inc.*, ASBCA No. 50519, 05-2 BCA ¶ 33,071 at 163,920 (citation omitted). In fact, the contract (and therefore the task order) also included DFARS 252.201-7000, CONTRACTING OFFICER'S REPRESENTATIVE (DEC 1991) which explains the COR is not authorized to make any commitments or changes affecting delivery or any other term or condition of the order (finding 1). Consequently, nothing in the record here indicates the contract specialist possessed the authority by himself to order Sungjee to stop work. Accordingly, as a matter of law, we cannot conclude that the email regarding the stoppage of work at the project site was, in and of itself, an effective suspension of the work. *Precision Dynamics, Inc.*, 05-2 BCA ¶ 33,071 at 163,921; *see also Lansdowne Steel & Iron Co., Inc.*, ASBCA No. 41110, 95-1 BCA ¶ 27,506 at 137,082 ("Even if the contract specialist suggested such a cessation of performance, as appellant contends, appellant stopped performance at its own risk, in the absence of a stop work order or other directive to do so from the contracting officer.").

Further, regardless of the contract specialist's instruction to Sungjee to suspend work, Sungjee was never going to complete the work by the modified CCD of August 31, 2018 (finding 52). As the record demonstrates, Sungjee had unreliable schedules (findings 31, 53). As an example, a revised contractor schedule dated June 29, 2018, showed a CCD of September 29, 2019, or three months to complete the work (finding 40); a July 31, 2018 project schedule showed a CCD of November 25, or four months to complete the work (finding 48); a revised August 2018 scheduled showed a CCD of January 2019 or four months to complete the work (finding 53); and a September 2018 timeline chart schedule showed Sungjee needed approximately 5.5 months to complete the work (finding 58). In addition, Sungjee lacked the financial means and personnel to complete the project (findings 13, 42, 44).

Moreover, one purpose of the last CCD extension was to obtain a realistic schedule and sufficient base pass applications to assess a path forward and decide Sungjee's ability to complete the project (finding 49). And the contract specialist specifically requested the schedule and base pass applications. Sungjee failed to

27

provide an adequate schedule showing all work and manpower (findings 60-62) and a sufficient number of base pass applications.

Finally, the stop work order issued by the contracting officer on September 20, 2018, was a precursor to the default termination. At that point, Sungjee was so far behind in its schedule due to its fault (as it admitted) (findings 19, 26, 27, 42-44) not even Sungjee had a reliable estimated time for completing the project (finding 53).

*Changes in Government Personnel*

And finally, Sungjee argues that the constant change in government personnel administering the task order caused poor and inefficient management, which resulted in many delays (app. br. at 13). Specifically, appellant argues that the government's inefficient management caused the issues relating to GFGI (*id.* at 13-14). We found no evidence in the record that the changes in government personnel managing the task order impacted the progress or schedule for the project (finding 69). While it is not clear why the government continued to provide Sungjee extensions, they nonetheless did upon the requests and promises made by Sungjee. At the end of the day, Sungjee failed to meet every contract extension requested and granted. Further, with respect to the GFGI, because Sungjee failed to meet the CCD, issues arose regarding the storage and installation of the furniture and appliances. We conclude that Sungjee presented no evidence that the government's conduct interfered with its ability to perform.

For all these reasons, we conclude that Sungjee has not shown the delay in completing the work arose from unforeseeable causes beyond its control and without its fault or negligence or any material breach by the government.[3] As a result, we also conclude Sungjee has failed to show the government acted in bad faith when terminating the order for default.

*The Government Admits it is Liable for Certain Costs Incurred Before the Termination*

Sungjee also appeals from the contracting officer's final decision denying its claim for additional payments. Specifically, Sungjee seeks money for completion of

---

[3] Sungjee argued in its complaint that the government arbitrarily rejected 80 door frames but only addressed the allegation in a few sentences in its Rule 11 reply brief (app. reply br. at 8). Accordingly, we deem this aspect of its claim to have been abandoned. *See Science and Mgmt. Res., Inc.*, ASBCA No. 60412, 19-1 BCA ¶ 37,236 at 181,243 (failure to address contention in hearing or post-hearing brief equated to abandonment of the issue). In addition, we note that we have carefully considered all the arguments made by the parties. To the extent they are not mentioned, they were irrelevant to our disposition of the appeals or were not persuasive.

28

96.8 percent of the work, transportation and storage fees of appliances, storage fees for furniture, additional work provided, and salaries of employees on standby from August to December 2018 (app. br. at 14; app. reply at 2, ). The government argues appellant failed to meet its burden to show the monetary claim is reasonable or the amount already paid by the government is inadequate compensation for the work performed (gov't reply at 31).

In general, a construction contractor who has been terminated for default is entitled to payment for work that was properly performed in accordance with the contract prior to the default termination. *J.G. Enters., Inc.*, ASBCA No. 27150, 83-2 BCA ¶ 16,808 at 83,543. Sungjee bears the burden to prove that it performed work for which it was entitled to be paid. *Truckla Servs., Inc.*, ASBCA No. 57564, 17-1 BCA ¶ 36,638 at 178,447-48. We hold that Sungjee has not met its burden.

*Percentage of Work Completed*

Sungjee relies on its contractor's daily reports to support its assertion it completed most of the project by May 2019. However, we found these reports unreliable and self-serving (findings 31, 67). Sungjee also relies on photos of the building but upon review, we found the photos show uninhabitable buildings with dangling lighting fixtures, unpainted/unfinished walls, incomplete floors and tile work; the pictures also fail to demonstrate whether it resolved the mold issue or completed the electrical, mechanical, or alarm systems (finding 68).

In addition, as discussed, the record is replete with Sungjee's admissions that beginning in December 2017, its performance was affected by financial issues. Further, in August 2019, Sungjee submitted a schedule stating it would take four months to complete a litany of projects, including restoration/landscaping, quarry tile at the stairs and washing rooms, installation of door accessories/toilet accessories, removal work on installed tile, installation of gypsum wallboard and tile in kitchen, installation of wood trim, placing VCT including baseboard, painting, installation of plumbing fixtures, installation of lighting fixtures, communication systems work, installation of receptacle cover, and fire alarm work and testing (finding 53). Later in August, Sungjee submitted another schedule showing it needed 167 days, or approximately 5.5 months, to complete the same work. We found Sungjee's assertion that it had completed 96.5 percent of the work is inconsistent with this August 2018 schedule showing that Sungjee needed 167 days (or five months) to complete the project (finding 68). Accordingly, we conclude Sungjee has not met its burden here.

*Transportation and Storage Fees of Appliances/Storage Fees for Furniture*

Sungjee also seeks transportation and storage fees for appliances, storage fees for furniture, and additional work provided. The government argues that pursuant to

Modification 03, Sungjee released and waived any claims arising from its request to extend the CCD (gov't br. at 37).

"A release is a contract whereby a party abandons a claim or relinquishes a right that could be asserted against another." *Holland v. United States*, 621 F.3d 1366, 1377 (quoting *Koules v. Euro-Am. Arbitrage, Inc.*, 689 N.E.2d 411, 414 (Ill. App. Ct. 1998)). As a release is contractual in nature, it must be interpreted in the same manner as any other contract term or provision. *Korte-Fusco Joint Venture*, ASBCA No. 59767, 15-1 BCA ¶ 36,158 at 176,455 (citation omitted). "[T]he inquiry regarding releases should focus on the intent of the parties at the time the release is executed[,] and this intent should be sought from the whole and every part of the instrument." *Futuronics Corp.*, ASBCA No. 29324, 85-2 BCA ¶ 18,137 at 91,045. Therefore, we first examine the plain language of the release and give the provisions their plain and ordinary meaning. *JAAAT Tech. Servs., LLC*, ASBCA No. 61792 *et al.*, 21-1 BCA ¶ 37,878 at 183,970.

With bilateral Modification 03, Sungjee agreed to release the government from any claims related to the extension in return for a new CCD. Sungjee did not agree to release the government from any and all claims, just those related to the August 2019 extension. At *that* point, the storage of appliances and furniture had been negotiated several months prior and did not relate to this modification.

However, we found Sungjee agreed to store and install the furniture and appliances as consideration for a previous extension (findings 13, 19, 23). In fact, Sungjee argues only that it did not agree to be held responsible for the delivery and installation if the delay was not its fault (app. br. at 25). We found that Sungjee failed to meet the CCD, as extended, and therefore the government had nowhere to put the appliances. As the delay was Sungjee's fault, we conclude Sungjee was responsible for these costs.

*Extra Work*

With respect to the alleged extra work completed (installation of electrical conduit and outlets and waterproofing of bathrooms), Sungjee fails to provide anything to support the supposition that it was extra work. Further, Sungjee states the government told it to install electrical outlets and water proofing work in return for the first extension of the CCD to December 23, 2017, but it never agreed to provide this work for no money (app. br. at 27-8). As the record shows, Sungjee repeatedly offered to provide extra work as consideration for extensions to the task order because Sungjee was responsible for the delay (*see* findings 13, 19, 23). In fact, Sungjee stated in its August 31, 2017, request for an extension that it performed additional work "for the user's convenience," and it requested no additional money, just the additional time (finding 7). The government's modification extending the CCD until December 23,

2017, quoted Sungjee (finding 8). We have no reason to doubt the contemporaneous statements made by Sungjee around the time the first modification extending the CCD was issued.

*Standby Costs*

Finally, Sungjee seeks standby costs. Sungjee states that the "actual claimed amount of ₩55,248,040 [won] represents the salaries of Sungjee's person[s] occurred from August to December 2018" (app. br. at 25 citing app. supp. R4, tab 97). This is the only argument Sungjee makes on this matter. *See also* app. br. at 14-15 (stating only that it is seeking salaries of individuals on standby from August through December 2018). Even though the parties did not argue this point, the claim was not presented to the contracting officer (*see* findings 72-73, 75; R4, tabs 166 (claim), 167 (COFD)). Therefore, the Board lacks jurisdiction over this issue. 41 U.S.C. § 7103(a)(1)(contractor claims shall be presented to a contracting officer for a decision).

Further, even if the Board had jurisdiction over this issue, we are justified in denying it because Sungjee's brief on this matter is devoid of citations to legal authority and contains undeveloped, unsupported and conclusory arguments. *See BES Const., LLC*, ASBCA No. 60608, 19-1 BCA ¶ 37,455 at 181,990.

CONCLUSION

Based on the foregoing, the appeals are denied.

Dated: July 11, 2023

_____
LAURA EYESTER
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

31

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 62002, 62170, Appeals of Sungjee Construction Co., Ltd., rendered in conformance with the Board's Charter.

Dated: July 11, 2023

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals